UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM FENWICK and TIMOTHY FISHER, on behalf of themselves and all others similarly situated,<br>    Plaintiffs, | : : : : : : | 3:06cv880 (WWE) |
| v. | : : | |
| THE ADVEST, INC. ACCOUNT EXECUTIVE NONQUALIFIED DEFINED BENEFIT PLAN, THE ADVEST, INC. ACCOUNT EXECUTIVE NONQUALIFIED DEFINED BENEFIT PLAN COMMITTEE, LOU DIMARIA, FRANK PAPARELLA, and KEN POLITI,<br>    Defendants. | : : : : : : : : : : : | |

**MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

The plaintiffs, William Fenwick and Timothy Fisher, brought this action on behalf of themselves and all similarly-situated adult participants and/or beneficiaries of the Advest, Inc. Account Executive Nonqualified Defined Benefit Plan ("AE Plan") who have been or will be denied benefits under the AE Plan because they terminated their employment at Advest. Plaintiffs assert claims for declaratory relief and to recover benefits pursuant to the Employee Retirement Income Security Act ("ERISA").

Defendants have moved for summary judgment on the complaint in its entirety, and plaintiffs have moved for summary judgment on the claim for declaratory relief. For the following reasons, plaintiffs' motion for partial summary judgment will be granted and defendants' motion for summary judgment will be denied.

**BACKGROUND**

The parties have submitted statements of fact with supporting exhibits and affidavits. The Court finds that the following facts are not in dispute.

During the time relevant to this action, Advest, Inc. was a Connecticut-based securities brokerage and investment management firm. It was a subsidiary of The Advest Group, Inc. ("AGI"). Advest's Board of Directors comprised account executives and officers of the corporation.

In October 1994, plaintiff Fenwick commenced work as a broker at Advest. On November 15, 1995, plaintiff Fisher began his employment at Advest. He became an account executive in March 1996.

Advest account executives were compensated based on the gross commissions that they generated for the firm.[1] The actual compensation paid to an account executive might vary based upon partnership arrangements that existed among some of the account executives.

Establishment of AE Plan

Advest established the AE Plan effective October 1, 1992.

Grant Kurtz, Advest's National Sales Manager, stated that he originated the concept of the AE Plan as a recruiting tool at a time when Advest was in an overall "weak financial situation." Kurtz wanted to replace The Advest Group, Inc. Amended and Restated Deferred Compensation Savings and Investment Plan, which was a plan for Advest's brokers that paid out benefits after six years of participation. Thus, he

---

[1] Gross commissions represented the total amount of commissions or fees paid to Advest by an account executive's clients for transactions or other services rendered.

sought to develop a plan that required a longer term of participation and did not pay out benefits until the attainment of a particular qualifying age.

In 1991, Kurtz first proposed the concept of the AE Plan to account executives serving on Advest's Board of Directors. The account executives rejected the proposed plan. He then worked with two account executives, Ted Fernberger and Don Cristo, to revise the original proposal.

After several months, Advest proceeded to adopt the proposed AE Plan. Coopers & Lybrand prepared the original draft of the AE Plan. On February 11, 1993, David Horowitz, who served as Assistant General Counsel for AGI, submitted a draft of the AE Plan to Advest management for comment. Kurtz stated that Advest established a revocable trust for the AE Plan in 1993 after brokers expressed concern that the AE Plan was unfunded.

On January 12, 1999, Alan Weintraub, then-Chief Executive Officer of Advest, sent a memorandum to the AGI Board of Directors requesting approval for a change in yield under the AE Plan. He explained that it was necessary to "increase benefits" under the AE Plan to "respond to competitive pressures" and ensure retention of Advest's "top brokers." Weintraub noted that while the AE Plan had been a "successful" and "critical retention tool," "the recent fall in treasury yields" was "of particular concern now as recruiting pressure on our top brokers, which had been substantial over the past year, has escalated dramatically."

Advest adopted the Third Amendment to the AE Plan, effective January 1, 1999, amending the Yield Multipliers section of the AE Plan to add 2% to the Treasury rate in order to counter the effect of declining Treasury rates on benefit projections.

In April 2000, a committee comprising Allan Fink, Vice President, Director of Sales Management and Planning, and account executives Ted Fernberger, Don Cristo, Paul Skydell and Bob Myers formed to review and suggest changes to the AE Plan. Advest retained Watson Wyatt Worldwide, Inc. to draft an amendment to the AE Plan implementing the requested changes.

The Fourth Amendment to the AE Plan was adopted effective May 1, 2000. This amendment modified the AE Plan to (i) provide for earlier benefit commencement at age 55, rather than at age 65; (ii) accelerate the deadline for the payment of death benefits; (iii) modify the definition of "permanent disability;" (iv) provide a "one-time pass" for a drop in gross production to avoid penalizing a broker for whom "isolated issues" reduced production during a particular year; and (v) provide for special treatment of mentor/junior arrangements, so that a senior broker in a senior/junior partnership could allocate all sales credits to the senior for purposes of the AE Plan only. A memorandum was sent to all AE Plan participants notifying them of the changes to the AE Plan.

<u>AE Plan Terms</u>

The AE Plan stated that it was available to "a select group of highly compensated account executives." The Advest Inc, Account Executive Nonqualified Defined Benefit Plan Committee ("AE Plan Committee") is the entity designated to act as the administrator of the AE Plan.

Eligibility was available to all of Advest's brokers who achieved a minimum level of "Gross Commissions" on purchases and sales of securities. At the inception of the AE Plan, only those brokers with gross commissions of at least $200,000 during fiscal

year 1992 were eligible to participate in the AE Plan.[2] The Gross Commissions Threshold rose to $245,000 by fiscal year 2002, after which point no new participants were permitted to enter the AE Plan. Participation in the AE Plan was not limited to brokers with any level of experience or with managerial responsibilities.

AE Plan participants accrued benefits in the AE Plan over a ten-year period. Payment of benefits did not necessarily commence upon completion of the ten-year period. As originally established, participants began to receive benefit payments upon (1) the attainment of age 65, if the participant had either completed ten years of service in the AE Plan or terminated employment with Advest; (2) permanent disability; (3) death; or (4) AE Plan termination. Effective May 1, 2000, Advest amended the AE Plan to allow participants to elect to receive payment of benefits at age 55, provided that the participant had completed ten years of service in the AE Plan. In 2002, the AE Plan was amended to allow for the payment of benefits to commence at age 50.

The AE Plan also provided for forfeiture of benefits in certain circumstances. A participant would forfeit his or her benefits under the AE Plan if the participant terminated employment at Advest prior to completing at least ten years of service in the AE Plan, unless termination of employment occurred (1) as a result of death or permanent disability, (2) after the participant attained age 65, or (3) more than nine months but not more than twenty-four months after a Change of Control (as defined in the AE Plan). A participant would also forfeit control if he or she became employed by another firm engaged in securities brokerage regardless of whether the participant had

---

[2]The amount of a broker's net pay was less than the amount of gross commissions produced.

accumulated more than ten years of service in the AE Plan, unless such participant terminated his or her employment at Advest more than nine months but not more than twenty-four months after a Change of Control.

The AE Plan provides that it is unfunded with all payments under the AE Plan to be paid "from the general funds of the Company."

Acquisition by Merrill Lynch

On September 14, 2005, AXA Financial Inc. and Merrill Lynch & Co announced that AXA and Merrill Lynch had entered into a "Stock Purchase Agreement" pursuant to which Merrill Lynch would acquire all of the outstanding stock of The Advest Group sometime during the fourth quarter for the year.

Effective October 31, 2005, in contemplation of Advest's acquisition by Merrill Lynch, Advest adopted the Second Amendment to the AE Plan. The Second Amendment eliminated the period from nine to twenty-four months following a Change of Control during which a participant could terminate employment without forfeiting benefits for failure to satisfy the ten-year vesting requirement. The amendment also modified the AE Plan by providing for full vesting and payment of accrued benefits to participants whose benefits had not yet vested but were still employed on June 30, 2007. Pursuant to Section 5.2, the AE Plan would automatically terminate when there were no participants or claims to benefits.

On December 2, 2005, Merrill Lynch completed its acquisition of the Advest Group. Thereafter, Merrill Lynch employees Lou DiMaria, Frank Paparella and Ken Politi were appointed to the committee that administered the AE Plan. Effective January 1, 2009, DiMaria, Paparella and Politi were removed from the committee that

administered the AE Plan, and they have not had any further role in the administration of the AE Plan.

### Plaintiffs' Participation

Plaintiff Fenwick commenced participation in the AE Plan in 1995. When he left Advest in November 2005, Merrill Lynch forfeited his accrued benefits under the AE Plan.

Plaintiff Fisher commenced his participation in the AE Plan on October 1, 1997. When he left Advest on December 9, 2005, Merrill Lynch forfeited his accrued Plan benefits.

### The Daft Case

Two months after the instant action was filed, several individual AE Plan participants seeking benefits that they alleged had accrued under the AE Plan filed an action captioned Daft v. Advest, Inc. in Ohio state court. The suit was subsequently removed to federal court.

On November 16, 2006, the District Court for the Northern District of Ohio stayed the case pending completion of administrative review before the AE Plan Committee. The AE Plan Committee denied the plaintiffs' claim for benefits, finding that the AE Plan was a top-hat plan and not subject to the minimum vesting and non-forfeiture provisions of ERISA. The plaintiffs appealed that denial to the district court, arguing that the AE Plan was not a top-hat plan as a matter of law.

Contemporaneous with that appeal, on May 9, 2007, plaintiffs filed an amended complaint with allegations that are substantially similar to that of the complaint filed in the instant action.

On November 13, 2007, the Ohio district court held that the AE Plan "was not a top-hat plan and was "subject to additional ERISA requirements, especially ERISA vesting requirements."  The Daft defendants filed a motion for reconsideration of that ruling, which motion was denied on January 18, 2008.  The defendants appealed to the Sixth Circuit.  This appeal is stayed pending the district court's award of specific relief.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American Int'l Group, Inc. v. London American Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Anderson, 477 U.S. at 249.

Plaintiffs argue that partial summary judgment is appropriate because defendants are collaterally estopped from arguing that the AE Plan is a top-hat plan and

8

because the undisputed facts demonstrate that the AE Plan is not a top-hat plan. Defendants move for summary judgment on the grounds that the AE Plan is indisputably a top-hat plan.  Alternatively, defendants argue that the AE Plan was not governed by ERISA as of 2000.  Defendants also contend plaintiffs cannot hold individual defendants DiMaria, Paparella and Politi liable because they no longer serve as administrators on the AE Plan Committee.

Upon review, the Court finds that defendants are collaterally estopped from arguing that the AE Plan is a top-hat plan and exempt from ERISA vesting and non-forfeiture requirements.  Under the doctrine of collateral estoppel or issue preclusion, a party is prevented from "relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 288 (2d Cir. 2002).  Under federal law, collateral estoppel applies when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 91 (2d Cir. 1997).

Non-mutual offensive collateral estoppel prevents a defendant who has had the opportunity to litigate fully and fairly an issue from relitigating that same issue against other parties in a subsequent suit.  See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.4 (1979); Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury, 270 Fed.

Appx. 52, 2008 WL 744933 (2d Cir. 2008).³  A party will be deemed to have been given a full and fair opportunity to litigate an issue if the issue was determined pursuant to an adjudicative proceeding where plaintiff was permitted to submit evidence and present argument.  Chauffeur's Training School, Inc. v. Spellings, 478 F.3d 117, 132 (2d Cir. 2007).

In this instance, application of collateral estoppel serves both the interests of judicial economy and fairness.  The Ohio district court in Daft considered the same benefit plan and the identical issues of whether the AE Plan violated ERISA's vesting and nonforfeiture provisions or was exempt from such ERISA requirements as a top-hat plan.  Defendants were given a full and fair opportunity to litigate this issue, and the determination of the AE Plan's top-hat status was integral to the decision on the merits finding for the plaintiffs in Daft.

In its ruling, the Ohio district court stated that it had "considered whether the AE Plan is a top-hat plan, with a resulting exemption from ERISA's vesting requirements."  Defendants were allowed full and fair opportunity to submit evidence and present argument to the district court in the Daft case.  In ruling against defendants, the Ohio district court held that defendants, as the parties asserting the top-hat exclusion, had the burden of establishing that the AE Plan fit that exclusion, and that defendants had access to the information necessary to their proof.

---

³A court has the discretion to decide whether to apply the doctrine of collateral estoppel and may consider its application according to judicial economy and the fairness. Parklane Hosiery, 439 U.S. at 331.

In arguing for reconsideration, defendants asserted, as they do in the instant case, that the Ohio district court made findings outside of the administrative record. Defendants asked the court to consider additional evidence on reconsideration. The district court reviewed whether the AE Plan constituted a top-hat plan, but it rejected defendants' arguments, affirming its original decision. It stated further that the additional evidence submitted by defendants was not adequate to establish that the AE Plan met the definition of a top-hat plan.

Accordingly, the Court finds that defendants are now collaterally estopped from relitigating the issue of whether the AE Plan meets the top-hat exclusion from ERISA requirements.

<u>AE Plan as Pension Plan</u>

Defendants argue that the AE Plan was not governed by ERISA because it was not a pension benefit plan. In their memorandum of law, defendants contend that "even if it were originally an ERISA pension benefit plan, as a result of a Plan design change effective in the 2000 Plan year, the AE Plan ceased to be an ERISA governed pension plan from at least that point in time." Plaintiffs set forth that defendants' argument runs counter to the express terms of the AE Plan and the undisputed facts.[4]

ERISA, 29 U.S.C. § 1002(a), defines an "employee pension benefit plan" as

> any plan, fund, or program . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or

---

[4] Plaintiffs also point out that defendants admitted in an answer to the complaint that the AE Plan was governed by ERISA. However, defendants' answer to the third amended complaint has withdrawn this statement. The Court will consider the issue on the merits.

beyond.

Plans that allow for payments made to employees "as bonuses for work performed" are specifically excluded from ERISA coverage by Department of Labor regulations. 29 C.F.R. § 2510.3-2(c). Such payments may, however, fall within ERISA coverage as employee pension benefit plans if they provide "retirement income" to employees or if they are "systematically deferred" until the termination of covered employment or beyond. Id.

Defendants maintain that the AE Plan, after the 2000 amendment, provided neither "retirement income" nor "deferral of income" for periods extending to the termination of covered employment or beyond. Originally, the AE Plan did not permit participants to begin receiving benefits until age 65, but the 2000 amendment allowed the AE Plan participants to elect to receive payment of benefits at age 55, provided the participant had completed ten years of service in the AE Plan.

The Court must determine according to the AE Plan's express terms or surrounding circumstances whether it was designed primarily for the purpose of providing retirement income or whether it contemplated the payment of post-retirement income only incidentally to a contract for current employment. Int'l Paper Co. v. Suwyn, 978 F. Supp. 506, 511 (S.D.N.Y. 1997). In considering the "surrounding circumstances" of a plan, a court may consider the purpose and promotion of the plan, the design and structure of the plan. See, e.g., Serio v. Wachovia Securities, LLC, 2007 WL 2462626 (D.N.J. 2007); see also Int'l Paper Co., 978 F. Supp. at 511 (considering factors including whether employee received benefits on a current basis, periodically during the course of employment, or incidentally after termination of employment or retirement).

A plan was held to be designed primarily for the purpose of providing retirement income where the evidence, including employer testimony, demonstrated that the plan's purpose was to procure retirement and payments under the plan were "retirement pay." Williams v. Wright, 927 F.2d 1540, 1547 (11th Cir. 1991).

In this instance, both the terms and structure of the AE Plan invoke ERISA provisions for retirement plans.  The AE Plan describes itself as a "defined benefit plan."[5]  ERISA provides that "in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit . . . ."[6] 29 U.S.C. § 1054(c)(3).  In Esden v. Bank of Boston, 229 F.3d 154, 163 (2d Cir. 2000), the Second Circuit explained:

> What these provisions mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at any other time ( e.g., on termination rather than retirement) or in any other form ( e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.

Generally, under Section 3.1 of the AE Plan, benefit payments commence at the normal retirement age of 65 unless the participant has elected an "Early Qualifying Age," in which case early qualifying payments started at age 55 and continued for ten years until the participant reached age 65.   Section 3.7 provides that the "Early

---

[5] ERISA, 29 U.S.C. § 1002(35), defines a "defined benefit" as "a pension plan other than an individual account plan."

[6] "Normal retirement age" is defined as the earlier of "the time a plan participant attains normal retirement age under the plan," "the time a plan participant attains age 65," or "the 5th anniversary of the time a plan participant commenced participation in the plan."

Qualifying" accrued benefit is determined by "projecting the Accrued Benefit at the Commencement Date which would have occurred under Section 3.1(a) absent any election (the "Original Commencement Date") and discounting that Accrued Benefit by the 30-year treasury bond yield in effect on the Accelerated Commencement Date, assuming annual compounding over the intervening period."  Thus, the AE Plan calculated the "Early Qualifying" accrued benefit in terms of the amount it would yield at "normal retirement age" or 65, which is consistent with 29 U.S.C. § 1054.

Further, the AE Plan § 3.3 provided that the "Accrued Benefit" at the "Commencement Date shall equal the Participant's Gross Commissions Average for the Initial Ten-Year Period multiplied by the Benefit Multiplier, the service and Production Multiplier and the Yield Multipliers (if any) of the Participant, reduced by the Participant's 401k Offset."  The "401K Offset" is the "aggregate of all contributions made by the Company on behalf of the Participant . . . to any tax-qualified retirement plans . . . , increased through project earnings on such amounts through such Commencement Date."  Accordingly, the AE Plan worked in association with the Advest 401K program to provide Advest employees retirement income rather than compensation for work performed.

The AE Plan's amendment to allow for benefit payments to be made during a participant's employment does not preclude its status as a pension plan in light of the fact that the benefits were only payable upon meeting certain age restrictions and were calculated in terms of the "normal retirement age."  See In re Silicon Graphics, Inc., 363 B.R. 690 (S.D.N.Y. 2007) (early withdrawal option did not prohibit plan from being employee pension plan governed by ERISA); Spitz v. Berlin Indus., Inc., 1994 WL

48593 (N.D.Ill. 1994) (finding ERISA pension plan despite fact that participant had access to funds while employed where, inter alia, such payments were restricted to participants reaching certain age); cf. Houston v. Saracen Energy Advisors, LP, 2009 WL 890384 (S.D.Tex. 2009) (not pension plan without term restricting benefits to attainment of certain age typically associated with retirement).

Plaintiffs also cite several "surrounding circumstances" demonstrating that the AE Plan provided retirement income.[7]  Plaintiffs point out that Advest represented on its Form 10k filing for the fiscal year ending September 30, 2000 that the AE Plan provided retirement benefits; it accounted for the benefits under the AE Plan as a pension expense; and its internal program calculated final benefits according to fields entitled "Early Retirement Date" and "Retirement Age."  According to the express terms of the AE Plan and the surrounding circumstances, the Court finds that the AE Plan provided retirement income and therefore qualified as a pension plan governed by ERISA.

Individual Defendants

Defendants argue that defendants DiMaria, Paparella and Politi should be dismissed from this case because they are no longer administrators of the AE Plan. Specifically, defendants assert that, in an ERISA action pursuant to 29 U.S.C. § 1132(a), only the plan and the administrators and trustees of the plan may be held liable.  However, in claims for breach of fiduciary duty, as opposed to claims for denial of benefits, ERISA, 29 U.S.C. § 1109, allows for a fiduciary to be "personally liable" on

---

[7]Defendants do not appear to dispute the facts cited as "surrounding circumstances" but argue that they are not relevant to the test for determination of a pension plan.

15

any losses caused by their breach of fiduciary duty.  See, e.g., LaScala v. Scrufari, 479 F.3d 213, 222 (2d Cir. 2007).

Defendants cite to no precedential authority for their proposition that former administrators may not be held personally liable for any losses that resulted from a fiduciary breach while they acted as fiduciaries.  To dismiss claims against individual fiduciaries on such basis would unfairly insulate fiduciaries from liability for wrongdoing and leave participants without a remedy for a breach of fiduciary duty.  The Court will not dismiss claims against these individuals.

## **CONCLUSION**

Based on the foregoing, the defendants' motion for summary judgment [doc. #145] is DENIED, and the plaintiffs' motion for partial summary judgment [doc. #150] is GRANTED.


_____/s/_____
Warren W. Eginton
Senior U.S District Judge


Dated this day \_22\_\_ of December, 2009 at Bridgeport, Connecticut.